*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MOHAMED A. HASSANEIN and EBTISAM
KHALIFA,

        Plaintiffs-Appellants,

v

ENCOMPASS INDEMNITY COMPANY and
SUPORT SERVICES, INC., also known as
ALTIMATE INSURANCE AGENCY,

        Defendants-Appellees,

and

BELLA L. ZAVALNITSKI,

        Defendant.

UNPUBLISHED
September 10, 2020

No. 347544
Genesee Circuit Court
LC No. 17-109603-CK

Before: CAVANAGH, P.J., and BORRELLO and TUKEL, JJ.

PER CURIAM.

In this insurance coverage dispute, plaintiffs appeal as of right the order granting summary disposition under MCR 2.116(C)(10) in favor of defendants, Encompass Indemnity Company (Encompass) and Suport Services, Inc. (Suport). For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

Plaintiffs Mohamed Hassanein and Ebtisam Khalifa are married to each other and were born in Egypt. They came to the United States in 2005 and purchased a home on Stonegate Parkway in Flint. Plaintiffs maintain citizenship with both Egypt and the United States.

-1-

From approximately 2005 to 2011, while plaintiffs' children were going to school in the United States, plaintiffs traveled from the United States to their apartment in Egypt once or twice a year during school breaks. Plaintiffs owned this apartment in Egypt before they purchased the Stonegate property and continued to own their apartment in Egypt at the time of the trial court proceedings. According to Khalifa, plaintiffs would stay in Egypt for approximately one to two months during the summer. Hassanein testified that the family would stay in Egypt for "a period of time" before returning and that he "would go to [Egypt] visit, not to live." Hassanein also testified that they did not stay in any specific place when they went to Egypt.

In 2009, Encompass issued policies of automobile insurance, as well as homeowner's insurance on the Stonegate property, to plaintiffs. Plaintiffs procured these policies through independent insurance agent Teresa Syed, who is the president and owner of Suport. At that time, Suport had been informed that plaintiffs traveled back and forth between Michigan and Egypt. However, boxes were checked on the homeowner's policy application indicating that the Stonegate property was used as a "primary" dwelling that was owner occupied. The Encompass insurance policies renewed annually. As relevant to the events that led to the instant litigation, these polices had been renewed to be effective from October 16, 2015 to October 16, 2016.

Beginning in 2011, plaintiffs continued to travel back and forth between the United States and Egypt but did not necessarily adhere to the same schedule they followed when they had children in high school. Hassanein had a health condition that made it difficult to handle Michigan's cold winter weather, so he usually came to the United States during the summer. Khalifa testified in her deposition that she would go to Egypt, "stay for a period of time, and then come back."

In 2015, plaintiffs leased the Stonegate property to a tenant for a six-month period while plaintiffs stayed in Egypt. Hassanein testified that plaintiffs had listed the property for sale without success. Rana Al Chach, the real estate agent, testified that the Stonegate property was listed for sale or rent in October 2015 because plaintiffs did not want to leave the house vacant.

On November 3, 2015, Suport employee Rachel DeShone and plaintiffs' son, Ahmed Zaki, exchanged emails related to discrepancies between Hassanein's name and address as listed on his driver's license and the information on file with respect to the insurance policy. DeShone wrote Ahmed the following email:

> The license lists your dad's name as Mohamed Zaki. On the policy it is listed as Hassenein. Also the address is different from what we have on file. Did you need me to change your address? Does your father still want the Stonegate Pkwy address insured?

Ahmed responded as follows:

> yea you can change it to zaki then .. and my dad is overseas .. the address on the license is my sis address .. we just put it there so when we get mail my sis can keep it… cuz currently no one is living at home! and that form.. what do you want me to do exactly? i don't have a printer at the moment

Apparently, DeShone did not change the mailing address for the policy at this time, but Syed subsequently changed the mailing address for the policy at the request of one of plaintiffs' sons.

Plaintiffs entered into an agreement to lease the Stonegate property to defendant Bella Zavalnitski for the term December 7, 2015 to May 31, 2016. Ahmed testified that plaintiffs intended to move back into the house following this lease and that plaintiffs planned to return from Egypt in July or August 2016. Kahlifa similarly testified that she intended to live at the Stonegate property when she returned from Egypt.

After the lease term expired, Zavalnitski held over as a month-to-month tenant. Khalifa decided to remain in Egypt during this time, thinking that "it'll be done in a month or two." Khalifa also testified that nobody gave Zavalnitski a deadline for leaving the Stonegate property for purposes of allowing plaintiffs to return. On July 25, 2016, however, a fire occurred at the Stonegate property.

Both plaintiffs indicated in their answers to interrogatories, which Encompass attached to its motion for summary disposition, that the Stonegate property was their United States residence from December 2005 to December 2015 and that an address in East Lansing was their United States residence from December 2015 to the present time. Their responses further indicated that since December 2015, they only spent the summer months in the United States and spent the winter months in Egypt. Additionally, there was deposition testimony from two of plaintiffs' children that plaintiffs would stay with their daughter in East Lansing, or two of plaintiffs' sons, when plaintiffs returned to the United States and while the Stonegate property was leased. There was further evidence specifically indicating that Khalifa never stayed at the Stonegate property while it was leased to Zavalnitski and that plaintiffs did not have keys or access to the Stonegate house at the time of the fire. However, the lease also included language stating, "Landlord reserves the right to enter the Leased Premises . . . for inspection, repair, alteration or addition, and for any other purpose whatsoever relating to the safety, protection, preservation or improvement of the Leased Premises or the building in which the Leased Premises is located."

Syed testified that at the time of the fire, she was not aware that plaintiffs had leased the Stonegate property and that plaintiffs never informed Suport that the property was being occupied by a tenant. Syed explained that she would have obtained a fire dwelling insurance policy for plaintiffs had she been aware of this information.

Encompass subsequently denied plaintiffs' insurance claim stemming from the fire because Encompass determined that plaintiffs were not residing on the premises at the time of the fire. Encompass cited a provision from the policy indicating that the policy covered damage to the "residence premises," as well as the policy's definition of "residence premises."

Specifically, the policy provided as follows:

**PROPERTY COVERAGE—HOME**

**REAL PROPERTY—INSURING AGREEMENT**

1. **Dwelling Owners—We** cover:

a.     The dwelling on *your residence premises;*

b.     Other structures on *your residence premises.*

Further, the policy defined "insured location" in relevant part to include "[y]our residence premises." The policy defined "residence premises" as "a dwelling, condominium, co-operative unit or apartment, other structures and grounds identified as the insured property on the coverage summary, where the person listed under Named Insured(s) on the coverage summary as the insured resides and which is principally used as a private residence."

Plaintiffs filed suit alleging breach of contract against Encompass and negligence against Suport.[1] Plaintiffs asserted that they were residing at the Stonegate property at the time of the fire, that Zavalnitski was temporarily occupying the home for six months as plaintiffs' tenant, and that plaintiffs had fully complied with the terms and conditions of the insurance policy. Plaintiffs alleged that Suport negligently failed to obtain an insurance policy that properly covered the Stonegate property after plaintiffs had informed Suport that they had leased the property to a tenant for six months.

Both Encompass and Suport moved for summary disposition under MCR 2.116(C)(10). The trial court granted Encompass's summary disposition motion, reasoning that under *Heniser v Frankenmuth Mut Ins*, 449 Mich 155; 534 NW2d 502 (1995), and *McGrath v Allstate Ins Co*, 290 Mich App 434; 802 NW2d 619 (2010), the language plaintiffs' insurance policy unambiguously required that plaintiffs live in the insured home and there was no genuine issue of material fact that plaintiffs had not been living on the premises for over nine months and had rented out the property. Furthermore, the trial court assumed that plaintiffs left personal property at the Stonegate home and intended to return there as plaintiffs contended, but the court concluded that these claims standing alone were insufficient as a matter of law under *McGrath* to show that plaintiffs resided on the premises at the time of the fire.

The trial court also granted Suport's summary disposition motion. The trial court noted that the email from Ahmed to Suport indicating that nobody was living at the insured premises was sent when plaintiffs had only been away from the premises for about a month and before plaintiffs leased the premises to Zavalnitski. The trial court concluded that this email, at most, gave Suport notice that plaintiffs were away from the premises temporarily, which would not negate coverage under the policy. However, the trial court ruled that this did not create a genuine issue of material fact that plaintiffs no longer resided at the premises such that they were in violation of the terms of the policy, rather than merely temporarily absent from the premises.

## II. STANDARD OF REVIEW

We review de novo a trial court's decision to grant or deny a motion for summary disposition. *Clam Lake Twp v Dep't of Licensing and Regulatory Affairs*, 500 Mich 362, 372; 902

---

[1] Plaintiffs also filed suit against Zavalnitski, and the trial court granted summary disposition in favor of Zavalnitski. Plaintiffs do not challenge this ruling on appeal. Zavalnitski is not a party to this appeal.

NW2d 293 (2017). A motion under MCR 2.116(C)(10) "tests the *factual sufficiency* of a claim" and may only be granted when the proffered evidence fails to establish a genuine issue of material fact. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019). "When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion." *Id*. If reasonable minds could differ on an issue after such consideration of the record, then a genuine issue of material fact exists. *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 425; 751 NW2d 8 (2008). Furthermore, issues concerning the interpretation of an insurance policy, including whether contract language is ambiguous, are also reviewed de novo. *Royal Prop Group, LLC v Prime Ins Syndicate, Inc*, 267 Mich App 708, 713-714; 706 NW2d 426 (2005).

## III. ANALYSIS

### A. ENCOMPASS

Plaintiffs argue that the trial court erred by granting summary disposition in favor of Encompass because the Stonegate property remained their residence while they were temporarily in Egypt. In the alternative, plaintiffs argue that the policy is ambiguous on the issue of whether the coverage required plaintiffs to reside at the insured premises.

> To determine whether an insured is entitled to insurance benefits, we employ a two-part analysis. "First, we determine if the policy provides coverage to the insured. If it does, we then ascertain whether that coverage is negated by an exclusion." It is the insured's burden to establish that his claim falls within the terms of the policy. [*Heniser*, 449 Mich at 172 (citation omitted).]

In *McGrath*, 290 Mich App at 439, this Court summarized the rules related to interpreting insurance contracts:

> The rules of contract interpretation apply to the interpretation of insurance contracts. The language of insurance contracts should be read as a whole and must be construed to give effect to every word, clause, and phrase. When the policy language is clear, a court must enforce the specific language of the contract. However, if an ambiguity exists, it should be construed against the insurer. An insurance contract is ambiguous if its provisions are subject to more than one meaning. An insurance contract is not ambiguous merely because a term is not defined in the contract. Any terms not defined in the contract should be given their plain and ordinary meaning, which may be determined by consulting dictionaries. [Citations omitted.]

As previously noted, the insurance policy at issue specifically provided, "**We** cover . . . [t]he dwelling on *your residence premises* . . . ." In turn, the policy defined "residence premises" as "a dwelling, condominium, co-operative unit or apartment, other structures and grounds identified as the insured property on the coverage summary, *where the person listed under Named Insured(s) on the coverage summary as the insured resides* and which is principally used as a private residence." (Emphasis added.) The policy does not define the term "resides."

The policy language unambiguously requires that the property at issue be the insured's "residence premises" for coverage to apply. There is no dispute that the Stonegate property was identified as the insured property or that plaintiffs were the named insureds. Thus, the issue is whether plaintiffs complied with the requirement that they "reside[]" on the Stonegate property such that the Stonegate property satisfied the definition of "residence premises"; under the language of the policy, there was no coverage if the Stonegate property was not plaintiffs' "residence premises."

This understanding of the pertinent policy language is supported by our Supreme Court's decision in *Heniser*, in which the Supreme Court analyzed similar insurance policy language. In that case, the "insured locations" was defined in relevant part to mean "the residence premises," and the "residence premises" was defined to mean the dwelling where the insureds "reside and which is shown as the 'residence premises' in the Declarations." *Heniser*, 449 Mich at 158 n 1. Interpreting this language, the *Heniser* Court held that "[t]o be a 'residence premises' the insured must reside at the insured premises *and* the property must be shown as the residence premises in the declarations portion of the policy." *Id*. at 167. The Court further held that "the exact language of this policy . . . unambiguously require[d] the insured to reside at the insured premises at the time of the loss." *Id*. at 168. Finally, the Court concluded that "the policy does not cover the destruction of the building unless the insured resides at the insured premises when the loss occurs." *Id*. at 171.

In *Heniser*, the plaintiff sold his vacation home on a land contract in November 1988. The property was insured under a homeowner's policy that expired in September 1989 by the defendant insurance company. *Id*. at 157. However, the plaintiff did not inform the defendant of the sale. *Id*. The property was destroyed by a fire in January 1989, and the defendant denied the plaintiff's insurance claim. *Id*. at 157-158. The defendant determined that the insurance policy did not cover the damage to the property because the plaintiff did not reside at the property at the time of the fire as required by the insurance contract. *Id*. at 158. The Supreme Court reached the same conclusion, stating that because the plaintiff "did not 'reside' at the premises at the time of the fire," the "property was no longer a 'residence premises,' and the policy does not provide coverage for the destruction of the building." *Id*. at 173.

Additionally, this Court in *McGrath* addressed the issue "whether the phrase 'where you reside' in the definition of the covered 'dwelling' preclude[d] coverage because of [the homeowner's] extended absence from the insured property." *McGrath*, 290 Mich App at 440. In that case, the homeowner had historically lived in her Gaylord, Michigan home for most of the year while spending winters in Florida. *Id*. at 436. Several years after purchasing the home, however, she became unable to care for herself and moved to an apartment in Farmington Hills to be closer to family and doctors. *Id*. at 437. She continued to own the Gaylord home, leaving the majority of her belongings there. *Id*. The homeowner and other family members occasionally visited the Gaylord property. *Id*. The homeowner's daughter contacted the insurance company and changed the billing address to the Farmington Hills address. *Id*. The Gaylord home subsequently suffered extensive water damage caused by a frozen pipe, and the insurance company denied coverage. *Id*. at 437-438.

The insurance company argued that the homeowner had failed to comply with the requirements of the policy because she did not reside at the Gaylord home at the time of the loss and had not notified the insurance company of the change in "title, occupancy, or use of the

property." *Id*. at 439. The insurance policy at issue in *McGrath* contained language similar to the policy language at issue in this case:

> The policy states that Allstate will "cover sudden and accidental direct physical loss" of covered property, which includes "[y]**our dwelling** including attached structures." As defined in the policy, " '**You**' or '**your**'—means the person named on the Policy Declarations as the insured and that person's resident spouse." "Dwelling" is defined as "a one, two, three or four family **building structure**, identified as the insured property on the Policy Declarations, where you reside and which is principally used as a private residence." The policy further states that the insured "must pay the premium when due and comply with the policy terms and conditions, and inform [Allstate] of any change in title, use or occupancy of the **residence premises.**" "Residence premises" is defined as "the **dwelling**, other structures and land located at the address stated on the Policy Declarations." [*McGrath*, 290 Mich App at 440 (alterations in original).]

To determine whether the policy provided coverage for the loss, this Court focused its analysis on the phrase, "where you reside," and whether this phrase required the insured to live at the premises at the time of the loss. *Id*. at 440-441. This Court held that under the policy language, "the insured must reside at the property not only at the time the policy becomes effective, but at the time of the loss." *Id*. at 442. This Court held that the term "reside," which was not defined in the policy, means in this context "to dwell permanently or for a considerable time; live," or "[t]o live in a place permanently or for an extended period." *Id*. at 441 (quotation marks and citations omitted). The *McGrath* Court further explained:

> The policy states that the "insured premises" means "the residence premises" and the coverage section states that the insured's "dwelling" is the covered property. (Boldface omitted.) The definition of "residence premises" uses the word "dwelling," which is specifically defined as a building structure "*where you reside and which is principally used as a private residence.*" (Emphasis added and boldface omitted.) Thus, the term "dwelling" is an integral part of the term "residence premises," which in turn is an independent part of the term "insured premises." . . .
>
> . . . "[W]here you reside" is an independent part of the definition of "dwelling," which not only defines the covered property, but is also incorporated in the definition of "residence premises." The language is not merely descriptive of the Gaylord house, but constitutes a statement of coverage; to be a "dwelling" covered by the policy, the building must be identified in the policy declarations, the insured must reside there, and the building must be used as a private residence. This indicates that the insured must reside at the property not only at the time the policy becomes effective, but at the time of the loss. [*Id*. at 441-442.]

Consequently, this Court held that "that the term 'reside' requires that the insured *actually live at the property*." *Id*. at 443 (emphasis added). Based on this determination, this Court in *McGrath* concluded that the trial court had erroneously ruled that there was a question of fact on whether the homeowner resided at the Gaylord property at the time of the water damage. *Id*. at

442. In reaching this conclusion, this Court specifically rejected the trial court's ruling that the homeowner "resided" in the Gaylord house when the pipe burst because there was evidence that "despite her move to Farmington Hills in 2003, [the homeowner] *intended* to return to the Gaylord house at some time in the future." *Id*. The *McGrath* Court further reasoned, "It is undisputed that [the homeowner] did not physically live at the Gaylord address when the pipes froze and burst or for two years before the loss and, therefore, she did not satisfy the requirement that she 'reside' in the house when the loss occurred." *Id*. at 444.

As we will explain below, our decision in *McGrath* controls the resolution of the arguments presented in the instant appeal with respect to plaintiffs' claim against Encompass.

Plaintiffs first argue that they were not required by the policy to "physically live" at the Stonegate property at the time of the fire and that they nonetheless continued to reside at the Stonegate property because they left personal property at the Stonegate property and *intended* to return at some point in the future. Although the arrangement of the relevant policy provisions in the policy at issue in this case differs slightly from the policy that was at issue in *McGrath*, both policies are fundamentally the same in that both ultimately required the insureds to *reside* on the subject property in order for coverage to apply. See *McGrath*, 290 Mich App at 441. Specifically, in this case, the definition of "residence premises" requires (1) that the dwelling is identified as the insured property, (2) that the named insured "resides" on the insured property, and (3) that the property is principally used as a private residence. There is no dispute over the first and third of these requirements here. Finally, the dwelling must be on the insured's "residence premises" for coverage to apply pursuant to the policy's provision defining the coverage provided for dwelling owners.

Contrary to plaintiffs' argument, the *McGrath* Court specifically held that in this context, the insured must reside on the subject property "at the time of the loss," *id*. at 442, and that "the term 'reside' requires that the insured *actually live at the property*," *id*. at 443 (emphasis added). Furthermore, although plaintiffs are correct that the *McGrath* Court recognized that an insured could be temporarily absent from the premises without negating coverage, *id*. at 444-445, the *McGrath* Court nonetheless held that leaving personal property on the premises coupled with a mere intention to return at some point in the future was insufficient as a matter of law to constitute residing on the property at the time of the loss, *id*. at 437, 442-444.

Plaintiffs in this case do not argue that they were actually living on the Stonegate property at the time of the fire. Indeed, there is no dispute that they had leased the property to a tenant for more than seven months and were in Egypt, where they owned an apartment, during this time. To the extent that plaintiffs may have returned to Michigan during the course of the lease, the record evidence presented to the trial court revealed that they stayed with their children rather than at the Stonegate property. The record also reflects that by the time of the fire, plaintiffs were spending the majority of the year in Egypt. In their appeal, plaintiffs rely solely on their intent to *eventually* return to Stonegate because they left items of personal property at the Stonegate property. Accepting these assertions as true, standing alone, these assertions are insufficient as a matter of law to meet the definition of "reside." *McGrath. Id*.

Regardless of their intended future actions, the evidence is undisputed that plaintiffs had ceased living in the Stonegate premises for a period of seven months preceding the fire, choosing

instead to stay in Egypt or at their children's separate residences when in Michigan. Under these factual circumstances, we are presented with a scenario more akin to the circumstances present in *McGrath* and *Heniser*. Accordingly, the trial court did not err by concluding that plaintiffs did not reside at the Stonegate property at the time of the fire.

Next, plaintiffs argue that the insurance policy at issue is "ambiguous regarding the residency requirement" because the application asked about occupancy without mentioning "residence" and the coverage summary did not mention "occupancy" or a "residence premises."

"[I]nsurance policies are subject to the same contract construction principles that apply to any other species of contract." *Rory v Continental Ins Co*, 473 Mich 457, 461; 703 NW2d 23 (2005). "[U]nless a contract provision violates law or one of the traditional defenses to the enforceability of a contract applies, a court must construe and apply unambiguous contract provisions as written." *Id.* "A provision in a contract is ambiguous if it irreconcilably conflicts with another provision, or when it is equally susceptible to more than a single meaning." *Royal Prop Group*, 267 Mich App at 715. We read the insurance contract as a whole, giving meaning to all terms. *Id.* "The policy application, declarations page of policy, and the policy itself construed together constitute the contract." *Id.*

In this case, the homeowner's policy application included a section labeled "occupancy" and that included the following options: owner, tenant, unoccupied, vacant. On plaintiffs' application, "owner" was marked on this section. Plaintiffs' application further indicated in other sections that the Stonegate property was used as a "primary" dwelling. The coverage summary listed the Stonegate address as the residence that was the subject of the property. We discern no irreconcilable conflict between the indication in the application that plaintiffs, as owners, occupied the Stonegate property as their primary dwelling and the policy requirement plaintiffs, as the named insureds, reside in the Stonegate property for coverage to apply. The policy's definition of "residence premises" specifically requires that the property listed as the insured property be the property where the insured resides. Plaintiffs' application indicated that the home would be occupied by the owners (i.e., plaintiffs) and not a tenant. Furthermore, as relevant to the circumstances at issue in this case, "occupy" means "to reside in as an owner or tenant." *Merriam-Webster's Collegiate Dictionary* (11th ed). Because there is no irreconcilable conflict between the provisions cited by plaintiffs, plaintiffs have not established the existence of an ambiguity in the insurance contract by relying on the above provisions. *Royal Prop Group*, 267 Mich App at 715.

Plaintiffs seemingly argue that the policy is ambiguous with respect to whether plaintiffs' intent to return to the Stonegate property establishes that they resided on the premises. In making this argument, plaintiffs rely on the policy's definition of "family member" and "resident spouse," both of which consider the person's intent to live on the premises in determining whether that person is considered a family member or resident spouse under the policy. However, neither the term "family member" nor "resident spouse" is implicated by the policy's definition of the dwelling covered under the policy, which is the provision at issue on appeal and provides that "**We** cover . . . [t]he dwelling on *your residence premises* . . . ." Neither the term "family member" nor "resident spouse" forms part of the definition of "residence premises." Accordingly, plaintiffs' argument again fails to demonstrate an irreconcilable conflict and the existence of an ambiguity in this regard. *Id.*

Next, plaintiffs argue that the policy is ambiguous because the policy "contains no exclusion barring coverage if Plaintiffs rented the property" and "contains several provisions allowing coverage when the property is rented." However, none of the provisions cited by plaintiff demonstrate that their insurance policy provided coverage if they were not residing at the Stonegate property.

Addressing this argument, again, the first step when determining whether an insured is entitled to insurance benefits is ascertaining whether "the policy provides coverage to the insured" and that it "is the insured's burden to establish that his claim falls within the terms of the policy." *Heniser*, 449 Mich at 172 (quotation marks and citation omitted). We have already quoted the pertinent part of the homeowner's insurance policy indicating what coverage was provided to the property owner plaintiffs in this case, but we reproduce it below for sake of convenience:

**PROPERTY COVERAGE—HOME**

**REAL PROPERTY—INSURING AGREEMENT**

1.      **Dwelling Owners—We** cover:

      a.      The dwelling on *your residence premises;*

      b.      Other structures on *your residence premises.*

As we have already concluded, there is no genuine issue of material fact that plaintiffs failed to satisfy the requirements under this provision for coverage to apply because they were not living, and thus were not residing, at the Stonegate property at the time of the loss.

In furtherance of their argument that an ambiguity nonetheless exists related to the permissibility of renting the property, plaintiffs first cite a portion of the policy's definition of "insured location." However, the pertinent provision of the policy defining the scope of coverage to be the dwelling or other structures on the "residence premises" does not use the term "insured location." The definition section of the policy indicates that it provides the "specific meaning" for certain terms used in the " **'Home'** Segment" of the policy. Thus, following the clear and unambiguous language of the contract as we must, *McGrath*, 290 Mich App at 439, the definition of "insured location" is not relevant to determining the scope of coverage applicable to plaintiffs because the pertinent provision of their policy defining the scope of their coverage does not use the term "insured location" and thus does not implicate the definition of that term that is included in the definition section of the policy. Because there is no irreconcilable conflict, plaintiffs have not demonstrated that an ambiguity exists. *Royal Prop Group*, 267 Mich App at 715.

Plaintiffs next rely on a provision of the policy providing additional property coverages and which provides coverage in relevant part as follows:

**2. Fair Rental Value.**

If a loss covered under **PROPERTY COVERAGE - HOME** makes *your residence premises* rented to others or held for rental uninhabitable, *we* cover its fair rental value, less any expenses that do not continue. . . .

However, plaintiffs have failed to demonstrate any genuine issue of material fact exists with respect to the lack of coverage for the loss under "**PROPERTY COVERAGE – HOME**," and this additional coverage provision therefore is inapplicable according to its own clear and unambiguous language. *McGrath*, 290 Mich App at 439. Accordingly, plaintiffs' reliance on this fair rental value provision does not establish an irreconcilable conflict or ambiguity. *Royal Prop Group*, 267 Mich App at 715.

Next, plaintiffs similarly rely on the following provision to support their claim of ambiguity:

**19. Landlords Furnishings.**

*We* will pay up to $5,000 for *your* appliances, carpeting, and other household furnishings in an apartment on *your residence premises* regularly rented or held for rental to others by any *covered person*. . . .

However, as previously explained, the Stonegate property was not plaintiffs' "residence premises" for purposes of the insurance policy because they did not reside there at the time of the loss. Accordingly, the clear and unambiguous language of the Landlords Furnishings provision indicates that this provision is inapplicable. *McGrath*, 290 Mich App at 439. Plaintiffs therefore have not demonstrated an irreconcilable conflict or ambiguity based on this provision. *Royal Prop Group*, 267 Mich App at 715.

Finally, plaintiffs argue that because leasing the property was not specifically prohibited by the policy in any exclusion of coverage, the Stonegate property remained covered under the policy. Again, there must be coverage in the first instance before any exclusion applies. *Heniser*, 449 Mich at 172. Here, there is no genuine issue of material fact that there was no coverage under the policy for the loss because plaintiffs did not reside at the property at the time of the loss. Thus, the lack of a specific exclusion is irrelevant. *Id*.

Plaintiff has not shown that the trial court erred by granting summary disposition in favor of Encompass.[2]

B. SUPORT

---

[2] We additionally note that to the extent plaintiffs seemingly rely on deposition testimony that the insurance policy language is unclear in order to support plaintiffs' appellate argument that ambiguity exists, plaintiffs are attempting to use extrinsic evidence to show the existence of a patent ambiguity. Because we find the language clear and unambiguous on its face and plaintiffs have not argued that a latent ambiguity exists, there is no need to consider extrinsic evidence. Extrinsic evidence may not be used "to interpret unambiguous language within a document," nor may extrinsic evidence "be used to identify a patent ambiguity because a patent ambiguity appears from the face of the document." *Shay v Aldrich*, 487 Mich 648, 667; 790 NW2d 629 (2010). Instead, unambiguous language in a contract must be enforced as written. *Rory*, 473 Mich at 461.

With respect to Suport, plaintiffs argue that the trial court erred by granting summary disposition of their negligence claim in favor of Suport. Plaintiffs specifically argue that Suport, as an independent insurance agent, breached its duty to procure an appropriate policy of insurance to cover the Stonegate property considering that Suport was aware of plaintiffs' history of traveling back and forth between Michigan and Egypt. Plaintiffs also argue that the record evidence established that Suport stood in a special relationship with plaintiffs and thus breached its duty to advise and counsel plaintiffs on procuring an appropriate insurance policy to cover the Stonegate property during the lease to Zavalnitski.

"To establish a prima facie case of negligence, a plaintiff must prove four elements: (1) a duty owed by the defendant to the plaintiff, (2) a breach of that duty, (3) causation, and (4) damages." *Case v Consumers Power Co*, 463 Mich 1, 6; 615 NW2d 17 (2000). "Whether a duty exists is a question of law that is solely for the court to decide." *Harts v Farmers Ins Exch*, 461 Mich 1, 6; 597 NW2d 47 (1999).

"An insurance agent owes a duty to procure the insurance coverage requested by an insured," and "[t]he insured's agent must strictly follow the insured's instructions which are clear, explicit, absolute, and unqualified." *Zaremba Equip, Inc v Harco Nat'l Ins Co*, 280 Mich App 16, 37-38; 761 NW2d 151 (2008) (quotation marks and citation omitted). An insurance agent generally "does not have an affirmative duty to advise a client regarding the adequacy of a policy's coverage," and the insured is instead "obligated to read the policy and raise questions concerning coverage within a reasonable time after issuance." *Mate v Wolverine Mut Ins Co*, 233 Mich App 14, 22-23; 592 NW2d 379 (1998) (quotation marks and citations omitted). However, although an insurance agent typically acts on behalf of both the insurer and the insured to facilitate the sale and execution of an insurance policy, "[t]he fiduciary duty that the insurance agent owes each party varies in relation to the agent's status as an independent or exclusive agent." *Genesee Foods Servs, Inc v Meadowbrook, Inc*, 279 Mich App 649, 654; 760 NW2d 259 (2008).

There is no dispute in the instant case that Suport is an independent insurance agent. "When an insurance policy is facilitated by an independent insurance agent or broker, the independent insurance agent or broker is considered an agent of the insured rather than an agent of the insurer." *Id*. (quotation marks and citation omitted). An independent insurance agent's "primary fiduciary duty of loyalty" is to the insureds "who [can] depend on this duty of loyalty to ensure that [the agent] [was] acting in their best interests, both in terms of finding an insurer that could provide them with the most comprehensive coverage and in ensuring that the insurance contract properly addressed their needs." *Id*. at 656.

Additionally, even an insurance agent whose principal is the insurance company and who owes no duty to advise the insured about coverage may nonetheless have a duty to advise the insured if a "special relationship" exists, which may be created if certain circumstances are present. *Harts*, 461 Mich at 8, 10. Our Supreme Court, in describing the creation of a "special relationship" between an insurance agent and insured has stated that "there must be 'some type of interaction on a question of coverage.' " *Id*. at 10 (citation omitted). Under *Harts*, a special relationship may be created under the following circumstances:

> (1) the agent misrepresents the nature or extent of the coverage offered or provided,
> (2) an ambiguous request is made that requires a clarification, (3) an inquiry is made

-12-

that may require advice and the agent, though he need not, gives advice that is inaccurate, or (4) the agent assumes an additional duty by either express agreement with or promise to the insured. [*Id*. at 10-11.]

In this case, there is no evidence that plaintiffs ever informed Suport of the facts that were material to the reasons that their homeowner's insurance policy did not cover the loss in this case, i.e., that they were going to be in Egypt and away from the Stonegate property for at least six months—which was half of the policy period—while the Stonegate property was leased to a tenant. Without being aware of these facts, Suport could not have advised plaintiffs on their homeowner's insurance needs under such circumstances even if they had a duty to do so since plaintiffs' extended absence from the Stonegate property while leasing it to a tenant is significantly different from their previous pattern—of which Suport was undisputedly aware—where they traveled to Egypt once or twice a year for shorter periods of time. See *Mate*, 233 Mich App at 17, 21-23 (noting that an independent insurance agent's failure to advise that the decedent was not "fully covered" under an automobile insurance policy was not a culpably negligent act because no such duty to advise was triggered where the decedent's mother had not informed the independent insurance agent that the decedent lived with her or ever inquired of the independent agent about the coverage that would apply to the decedent).

To the extent plaintiffs rely on the admittedly vague email exchange between Ahmed and Suport's employee DeShone, the email indicated that plaintiffs were "overseas" and not at home, which are facts not entirely inconsistent with plaintiffs' previous travel practices. Ahmed's email also indicated that the address on Hassanien's license was Ahmed's sister's address where plaintiffs were receiving mail. There is nothing in the email to provide notice to Suport that plaintiffs intended to be absent from the property for a significant length of time and were going to lease the property to a tenant. Accordingly, the email does not create a question of material fact regarding Suport's obligation to advise plaintiffs about coverage issues of which Suport was not aware. *Id*.

Moreover, even assuming that Ahmed was effectively acting as an agent on behalf of plaintiffs, Ahmed did not make any request or inquiry of DeShone other than permitting her to change Hassanein's last name on the policy. DeShone did not make any representations about the nature or extent of plaintiffs' insurance coverage or make any express agreement or promise to assume any additional duties. Thus, there is no genuine issue of material fact that a special relationship was not created. *Harts*, 461 Mich at 10-11[3]; see also *Pressey Enterprises, Inc v Barnett-France Ins Agency*, 271 Mich App 685, 689; 724 NW2d 503 (2006) (explaining that under the *Harts* test, a statement by the insured did not constitute "an inquiry that called for clarification").

It is also undisputed that the mailing address on the policy was eventually changed, although perhaps not as a direct result of the above email exchange. However, as this Court has

---

[3] Plaintiffs argue on appeal that the *Harts* test is inapplicable to independent insurance agents such as Suport in this case. We need not address this question here because even assuming that it is applicable to this case, there is no question of material fact that a special relationship was not created.

previously held, the mere act of changing the billing address for the policy is insufficient as a matter of law to give notice that plaintiffs were no longer residing on the property "[b]ecause a billing address may differ from the address of a residence premises for various reasons," *McGrath*, 290 Mich App at 447. Accordingly, changing the address on the policy did not trigger a duty on the part of Suport to advise regarding additional or different insurance coverage.

Finally, plaintiffs' attempt to rely on the opinion of an expert witness to show that a duty arose is unavailing. The question whether a duty exists is one of law "that is solely for the court to decide," *Harts*, 461 Mich at 6, and an expert's opinion may not extend to "legal conclusions" or "testimony regarding a question of law[] because it is the exclusive responsibility of the trial court to find and interpret the law." *Lenawee Co v Wagley*, 301 Mich App 134, 160-161; 836 NW2d 193 (2013) (quotation marks and citations omitted).

Plaintiffs have thus failed to show that the trial court erred by granting Suport's motion for summary disposition. No costs are awarded. MCR 7.219(A).

Affirmed.

/s/ Mark J. Cavanagh
/s/ Stephen L. Borrello
/s/ Jonathan Tukel

-14-